IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 3 0 2006

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

CHARLES WHITE, JR., )
)
             Plaintiff, )
)
    v. )
) Civil Case
JOHN E. POTTER, Postmaster ) No. 1:03-CV-0130-JEC
General, United States Postal )
Service, )
)
             Defendants. )
_____)

**ORDER & OPINION**

This case is before the Court, following a bench trial held on November 29, 2005. The Court has reviewed the transcript of the trial and the parties' proposed findings of fact and conclusions of law. It now issues its own findings and conclusions.

**FINDINGS OF FACT**[1]

1.  Plaintiff White ("White") was born on June 21, 1944 and was fifty-four years old at the time that he applied for the promotion at issue. [Transcript ("Tr.") 3:25-4:1].

---

[1]   The plaintiff, who for cost reasons did not order a transcript, has submitted a brief summary of the facts that the plaintiff contends the Court should adopt. Defendant has submitted a very detailed factual recitation, with cites to the transcript. For that reason, the Court has largely adopted the format and wording of the defendant's proposed findings to the extent that the Court agrees with a particular finding.

2.   White had become employed with the U.S. Postal Service ("Postal") in September 1969.   [Tr. 5:11-14; Plaintiff's Exhibit ("P") 9; Joint Exhibit ("J") 2].

3.   There are three mail processing centers in the Atlanta area: the Crown Road facility, the North Metro facility in Duluth, and the airport facility.  (Tr. 125: 17-20).

4.   White began working at the North Metro mail processing facility in Duluth, Georgia ("N. Metro") in 1990.  [Tr. 7:4-8:7]

5.   By 1993, White had been promoted to the position of Manager of Maintenance Operations ("MMO") at N. Metro, at the pay grade of EAS 20.   [Tr. 11:9-12:1; P-9; J-2]

6.   The duties of an MMO included the responsibility for all maintenance activities within a plant, both within the four walls of the plant and the outside grounds, including the responsibility for maintenance of mail processing machinery and equipment. ["Tr. 12:12-13:1; 160:15-20]

7.   The only difference in MMO positions is that the pay grade is determined by the volume of mail processed at the MMO's plant.  [Tr. 12:2-11; 13:2-14; 46:2-7; 67:3-7].

8.   On or about November 25, 1998, White applied, and was subsequently rated qualified, for a vacant MMO position, with a pay grade level of EAS-22, at the Crown Road mail processing plant in Atlanta, Georgia, under Vacancy Announcement number 04371.  [Tr. 12:2-6; P-9; J-1; J-2; J-11]

-2-

9.  At the time he applied for the Crown Road MMO position, White had been a Postal employee for 29 years, the most recent 6 years of which were as MMO at N. Metro.  [Tr. 26:25-27:4; P-9; J-2]  Thus, while the plaintiff was an MMO at the North Metro center, with a pay grade of 20, he was seeking the comparable position at the Crown Road plant, which, with a larger volume of mail, constituted a grade 22.

10. Jimmy Davenport was the Selecting Official for the Crown Road MMO vacancy, under vacancy announcement 04371.  [Tr. 93:23-94:14]

11. Davenport's responsibility as Selecting Official included reviewing applications referred to him by a screening panel, conducting interviews of those candidates, and recommending one candidate for selection.  [Tr. 94:10-25; 96:10-19]

12. Davenport had known White personally since 1990 when he was White's immediate supervisor and he generally considered White to have been a good supervisor.  [Tr. 92:14-22; 23-93:7]

13. During his tenure as White's supervisor, Davenport once had occasion to discuss with White his failure to hold his subordinate employees accountable for maintenance of machinery and controlling leave, which issue Davenport believed White to have subsequently addressed and corrected.  [Tr. 111:12-112:15]

14. George Martin was the Concurring Official for the Crown Road MMO vacancy under announcement 04371.  [Tr. 126:21-127:13]

-3-

Martin's responsibilities as Concurring Official included the duties of reviewing the promotional package and, provided he agreed, concurring with the selection as a condition of it becoming final. [Tr. 127:6-13]

15. Concurrence of both the Selecting and Concurring officials was required in order for the selection to be approved. [Tr. 113:2-5]

16. Martin was Davenport's immediate supervisor at the time of the selection. [Tr. 125:22-24]   Martin was also the lead plant manager for the Atlanta metropolitan area and had administrative responsibility for all mail processing plants in that area, including N. Metro. [Tr. 125:12-21]

17. David Williams, Plant Manager of N. Metro, reported directly to Martin and spoke with him on a daily basis regarding mail processing operations and other matters. [Tr. 126:3-6; 133:5-10]

18. As the manager for the entire plant, Williams was not, by title, White's first-line supervisor, but instead was White's second-line supervisor.   Due to vacancies at various times during his tenure as Plant Manager of N. Metro, however, Williams was at times White's immediate supervisor. [Tr. 15:23-25; 154:5-13]

19. Sean Andrews also submitted an application and was rated qualified for the Crown Road MMO vacancy under vacancy announcement 04371, which position White had applied for.

-4-

[Tr. 141:21-142:4; P-14; J-3; J-11]

20.  Andrews' date of birth is March 27, 1964 and he was 34 years old at the time of his application.  [Tr. 141:1-2]

21.  At the time Andrews applied for the Crown Road MMO position, he had been a Postal employee for 18 years, the most recent 2 years of which were as an MMO in Albuquerque, New Mexico, with a pay grade of EAS 18.  [Tr. 141:21-142:12; J-3]

22.  At the time of his application, Andrews had also been selected for and was participating in the National Maintenance Leadership Program (NMLP).  [Tr. 65:20-22; 101:25-102:11; 150:10-12; J-3]  The NMLP is a two-year Postal Service program designed to identify high potential candidates for succession into maintenance department leadership positions, such as department heads.  [Tr. 150:10-20; 107:22-23]

23.  People over the age of 50 were eligible to participate in the NMLP.  [Tr. 105:20-22; 68:9-11]    White had neither applied for nor participated in the NMLP.  [Tr. 67:13-14]

24.  Davenport participated as a mentor in the NMLP from 1995 thru 1997.  [Tr. 105:4-11] Davenport considered the NMLP to be a very prestigious program which did an excellent job training and mentoring its candidates.  [Tr. 110:16-111:4]

25.  Through his participation in the NMLP, Andrews was detailed to an MMO position in New Jersey at the pay grade level of EAS 23 at the time that he was under consideration for the MMO EAS 22 position at Crown Road.  [Tr. 102:12-24]

-5-

26. Due in part to his participation in the NMLP, which included temporary job details which were more current and at a higher EAS level than White's MMO position at N. Metro, Andrews' credentials were viewed by Davenport as being equal to White's. [Tr. 101:25-102:24]

27. Davenport considered current job details to be important because Postal procedures, machinery and equipment were constantly changing and Andrews' more current experience by way of job details was regarded by Davenport as a plus. [Tr. 111:5-11]

28. Martin, the reviewing official, did not know either White or Andrews at the time of the selection. [Tr. 43:12-17; 130:21-131:1]

29. A panel reviewed all applications received under vacancy announcement 04371 and forwarded the applications of five individuals, including White and Andrews, to Davenport for consideration. [Tr. 94:15-20]

30. Davenport did not review performance appraisals as part of the review process. [Tr. 101:15-24]

31. Davenport conducted individual interviews of all five candidates referred by the panel. [Tr. 94:21-95:2] Davenport interviewed White on March 4th, 1999. [Tr. 26:14-18] Davenport interviewed Andrews within days after interviewing White. [Tr. 95:3-19]

32.  After interviewing Andrews, Davenport was very impressed with Andrews' interpersonal skills.  [Tr. 113:19-114:2; 115-19-25]

33.  Davenport was not aware of Andrews' age at the time of the selection.  [Tr. 99:14-16; 100:14-16]  Davenport was not aware of White's age at the time of the selection nor White's proximity to retirement eligibility [Tr. 100:13-22], albeit Davenport knew White, and had met Andrews, and thus could certainly have had some idea of their relative ages.

34.  Davenport considered White and Andrews to be very close candidates with equal credentials.  [Tr. 97:20-98:4; 101:25-102:11; 122:24-123:1]

35.  After competing the review and interview process, Davenport initially selected White for the position.  [Tr. 96:10-19] Davenport selected White over Andrews because the MMO position at Crown Road had been vacant for approximately 6 months and White was a local candidate who could have filled the position immediately, without having to relocate to the Atlanta area. [Tr. 114:3-115:1]

36.  Davenport delivered to Martin for his review, the applications submitted by all 5 candidates, as well as his recommendation that White be selected for the position, but he did not discuss the selection with Martin at that time.  [Tr. 96:22-97:5]  Martin was not aware of either Andrews' or White's ages.  [Tr. 131:8-11 & 18-20]

37.  At some point near the time that he received the application packages, along with Davenport's recommendation that White be selected, Martin had occasion to discuss White's performance as MMO at N. Metro with David Williams, who had been Plant Manager of N. Metro since the fall of 1996.  [Tr. 132:5-23; 162:7-12; 154:21-155:2]

38.  The conversation between Martin and Williams occurred during the course of a normal daily discussion of mail processing operations, in which a variety of topics were mentioned.  [Tr. 133:5-10]

39.  When asked by Martin about White's performance, Williams told Martin that he was very impressed with White's analytical abilities, especially his tracking of the performance of certain equipment and machinery, but that he was not impressed with White's  ability to hold his supervisors accountable for performance.  [Tr. 163:9-164:21; 165:4-11]

40.  Williams characterized his appraisal of White as "balanced;" that is, Williams' technical skills were good, but his managerial skills were wanting. [Tr. 164-165]

41.  By way of explanation of the opportunities that Williams had to make the above assessment, set out in ¶¶ 39-40, Williams had been sent to N. Metro plant to "clean up" its poor overall performance.  [Tr. 170:10-21]

42.  Williams was especially dissatisfied with the maintenance division at N. Metro.  [Tr. 53:5-10; 165:12-19; 167:21-168:10]

43. Maintenance performance in the Atlanta metropolitan region was among the worst in the country, which created additional pressure on Williams as Plant Manager to improve the maintenance performance at N. Metro. [Tr. 167-21-168:16]

44. White initially got along well with Williams when he first became Plant Manager at N. Metro [Tr. 39:14-40:7], but Williams eventually began to express to White his dissatisfaction with White's management of subordinate employees. [Tr. 49:9-13]

45. Williams' dissatisfaction with White's management of subordinates stemmed in part from his view that White was doing work that his subordinates were responsible for performing. [Tr. 54:14-17] White's responsibilities as MMO included the responsibility to get his subordinate supervisors to adequately perform their job duties. [Tr. 57:3-18]

46. Williams issued a disciplinary Letter of Warning to White in May 1998. [Tr. 16:3-5; 157:15-158:3; 158:12-159:4; Defense Exhibit ("D") 1] The Letter of Warning was issued because White failed to have his subordinate supervisors carry out Williams' specific instructions to White regarding the servicing of certain machinery. [Tr. 16:3-5; 168:22-170:15; Defendant-1]

47. Williams had numerous discussions with White and other maintenance managers about performance and holding subordinate supervisors accountable for performance. [Tr. 170:10-21]

-9-

48. In addition, Williams had hired Robert Kulig, an individual over the age of 50, for the position of Maintenance Manager. Kulig was White's immediate supervisor at N. Metro.   [Tr. 171:11-21]

49. Kulig gave White a "fully meets expectations" rating, but noted in White's mid-year, 1999 evaluation that team effort under White's supervision was not where it should have been. Kulig therefore required White to lay out a plan to "improve the environment on Tour 3 and present indicators showing what [was] done and how it has improved the situation."  [Tr. 58:3-60:7; Plaintiff-5]

50. Both Williams and Kulig had told White that he was not getting his subordinate supervisors to perform.  [Tr. 60:1-7; 170:10-21; Plaintiff-5]

51. Thus, Williams' dissatisfaction with White's management skills began well before White applied for the Crown Road MMO vacancy.  [Tr. 55:2-17]

52. It was with this background information, set out in ¶¶ 41-51, that Williams conveyed his assessment of White to Martin, as described in ¶¶ 37-40.

53. Davenport was unaware of the conversation between Williams and Martin.  [Tr. 115:12-14]

54. A few weeks after delivering the package to Martin, and subsequent to Martin's conversation with Williams, Davenport and Martin discussed the selection.  [Tr. 97:13-98:7; 128:25-

129:11; 132:24-133:1]

55. During their discussion, Davenport sensed that Martin had concerns with his selection of White, but he did not discuss those specific concerns with Martin. [Tr. 97:13-98:7] The basis for Davenport inferring some concerns was the fact that Martin did not sign off at that time on Davenport's recommendation of White. Moreover, Martin inquired about Sean Andrews and asked Davenport to contact Andrews' supervisor. [Tr. 97-98, 109-110].

56. As it turned out, Davenport was unsuccessful in his effort to reach Andrews' supervisor, but he did not report this to Martin. As a result of their discussion, Davenport had concluded that Martin wanted him to reconsider Andrews as a candidate, but Davenport did not feel that Martin was attempting to coerce him into doing so. [Tr. 97:20-98:25; 119:5-10]

57. Martin never told Davenport that he would not concur with his selection of White for the position. [Tr. 116:12-16]

58. After their discussion of the selection, Davenport changed his selection recommendation from White to Andrews and presented the Recommendation Memo to Martin for concurrence. [Tr. 133:17-25]

59. Davenport had considered both White and Andrews to be qualified for the job.

-11-

60.  The Recommendation Memo selecting Andrews for the Crown Road MMO position was signed by Davenport on April 8, 1999 and by Martin on April 12, 1999. [Tr. 116:17-117:15; 135:18-136:16; J-11]

61.  White received notification of non-selection for the Crown Road MMO position on May 16th or 17th, 1999. [Tr. 20:9-14]

62.  White requested informal counseling on May 27, 1999, alleging, among other things, age discrimination. [J-4]

63.  At the time White requested informal counseling, he knew nothing about Andrews, his job experience, education or other qualifications for the position. [Tr. 63:5-8; 65:4-19]

64.  White does not contend that Davenport discriminated against him and cannot say that Martin discriminated against him. [Tr. 80:12-20]. White places most of the responsibility for the decision on Williams, who gave the above-described assessment to Martin, although he cannot say what role if any Williams played. [Tr. 60:8-61:1]

65.  White was subsequently upgraded to the EAS 22 pay grade in 2000 and remained at that pay grade, with all attendant retirement and other benefits, until he retired. [Tr. 68:12-69:22]

66.  White went on disability leave as of October 23, 2001 and did not return to work at Postal but, instead, applied for retirement effective October 1, 2002. [Tr. 78:22-24; J-13; J-14]

-12-

67.  White retired as part of a settlement of a proposed separation from employment with Postal based on his purported inability to perform the duties of his position, due to stress.  [J-14]

68.  Kulig instituted the proposed separation based on White's medical inability to perform the duties of his position, the fact that White had been on disability status for stress for approximately one year, and White's inability to say when he would be able to return to work.  [Tr. 74:17-75:2]

69.  The Court concludes that neither White's nor Andrews' age played a role in Davenport's ultimate recommendation, in Martin's initial hesitancy at selecting White, or in Williams' assessment of White's managerial abilities to Martin.

## CONCLUSIONS OF LAW

Both parties have couched their legal analysis of the case in the context of the *McDonnell-Douglas* framework.  That was the framework utilized by the magistrate judge and this Court, earlier, in denying the defendant's motion for summary judgment.  At this juncture, however, the Court has conducted a bench trial and must reach a determination on all the evidence as to whether the plaintiff White has proved that the defendant discriminated against him on the basis of age when defendant did not give him the promotion that he had sought.  Cf. *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1150 (11th Cir. 2005)("because a full trial on the merits had been held, 'the question of whether [plaintiff] properly made out a *prima facie* case is no longer relevant'")

-13-

(quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997)). Thus, the Court decides this ultimate issue of fact,[2] just as a jury would do, and does not address further the *McDonnell-Douglas* test.[3]

The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 633a, requires that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . be made free from any discrimination based on age." *Id.*, § 633a(a). Courts may rely upon Title VII precedent in interpreting comparable provisions of the ADEA. *See, e.g.*, *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756 (1979); *Hodgson v. First Fed. Savings & Loan Ass'n*, 455 F.2d 818, 820 (5th Cir. 1972).

Direct evidence is evidence, which, if believed, proves the existence of a fact without inference or presumption. *See Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989). Plaintiff has produced no direct evidence of unlawful age discrimination. Moreover, each of the individuals arguably involved in the decision-making process--Davenport, Martin, and Williams-- vigorously deny that plaintiff's age had any role in the promotion

---

[2]    The Court does not address the defendant's motion for directed verdict, but has instead considered all the evidence and rendered a decision, just as a jury would do.

[3]    Even were the framework applicable, the result would be the same. That is, the Court concludes that the plaintiff made out a *prima facie* case, that the defendant introduced evidence that the employment decision was made for independent and legitimate non-discriminatory reasons, and that the plaintiff has failed to prove any pretext in the reasons offered by defendant for the decision.

-14-

decision that was ultimately made.   Therefore, plaintiff has attempted to prove the existence of age discrimination through circumstantial evidence.

Clearly, plaintiff, who was 54 years old, has proved that he was in a protected age group and that he adversely affected by an employment decision, in that he did not receive a promotion for which he had applied.   Plaintiff has also proved that he was qualified for the position and that the employee who received the position was substantially younger than plaintiff.   The pivotal fact in this case, as in most age discrimination trials, is whether the plaintiff's age was a factor in the employer's decision.   To prevail on an age claim, the employee must prove that his age was at least a part of the reason why the employer made the decision in question.   *Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998).   On this latter point, the plaintiff has failed to persuade the Court that his age played any role in the defendant's decision to promote Andrews, instead of plaintiff, to the position in question.

As noted, there were three management personnel of the defendant's who either had input or made the decision to promote Andrews.   First, Jimmy Davenport was the selecting official.   Mr. Davenport initially picked the plaintiff for the position at Crown Road.   Thus, it is difficult to see how Davenport was operating from any age-based bias.   Davenport noted that the plaintiff and Andrews were close in qualifications, but that he had first picked

-15-

plaintiff because he was already in Atlanta and could assume the position immediately, whereas Andrews had to move from out-of-state.

Davenport did not ultimately select the plaintiff, however, because when he presented his choice to George Martin, who was the lead plant manager for the entire Atlanta metropolitan area and who was the reviewing official, Martin indicated some hesitancy about picking the plaintiff, although he articulated no particular objections. Instead, Martin asked whether Davenport had looked into Andrews, and he asked Davenport to contact Andrews' supervisor.

As it turned out, Davenport had been interested in Andrews and had narrowed his initial choice down to Andrews and the plaintiff. Indeed, Davenport was very favorably impressed with Andrews. He testified that Andrews had a real "presence" during the interview and exhibited excellent people skills. Moreover, Andrew had been through a leadership development program and had more current training than did the plaintiff. As Martin did not seem enthusiastic about plaintiff and as Davenport had felt that plaintiff and Andrews were close in qualifications, Martin decided to change his recommendation to plaintiff. Davenport indicated that had he felt coerced to make this decision or had he felt that Andrews was not a good choice, he would have pushed back. Again, there is nothing about this reasoning process and nothing about Davenport's testimony or demeanor that suggests to the Court that

-16-

plaintiff's age played any role in these events.

With regard to Martin, and unknown to Davenport, Martin had discussed the plaintiff with David Williams, who was the plant manager at the North Metro facility where the plaintiff worked. As recounted *supra* in the factual recitation, Williams had had some issues with plaintiff concerning the latter's ineffectiveness in managing staff under plaintiff's supervision. Williams reported to Martin that the plaintiff was, himself, a very strong employee in terms of technical and analytic skills.[4]   Nevertheless, Williams indicated that the plaintiff had demonstrated some real deficiencies as a manager.[5]   These management issues were of concern to Williams because he had been having "struggles" in the maintenance department, which was "amongst the worst in the

---

[4]   "Mr. White was doing a great job tracking performance of each piece of equipment on an hourly basis, looking at jams, looking at bypass rates and really focused in charting out performance.  And I was very impressed with his focus on that area, particularly when we were struggling to meet our service objectives.   And in my experience on an operating tour like tour three was, in my experience as plant manager I had never had a maintenance manager that got into that much detail on equipment performance for that piece of equipment.    So I was very impressed and I told Georgia Martin that."   [Tr. 163:17-25; 164:1]

[5]   "I also told George Martin that I was not impressed and that I thought that Mr. White lacked the skills necessary to hold his supervisors accountable.   And while he was doing a great job focusing on that one piece of the operation, there were many pieces of the operation that were falling apart."   [Tr. 164:2-6]   "And so I told George Martin that I didn't think that his managerial skills were at the level that he needed them to be at to hold his managers accountable and to keep the entire maintenance performance up where it needed to be.   And while I was pleased with the AFCS operation, I was very dissatisfied with the rest of maintenance. [Tr. 164:11-15]

-17-

country." (Tr. 168: 2-10).

Clearly, Martin's hesitancy about the plaintiff, which is what caused Davenport to choose Andrews instead, was based on the above conversation with Williams, as well as other discussions that the two men had, from time to time, about maintenance issues. Yet, there is nothing in the evidence, nor did the Court discern anything from Martin's words or demeanor, to suggest that age played any role in his hesitancy. Given what Williams had told him and given the problems that the maintenance department had experienced, some hesitancy about choosing the plaintiff was an understandable reaction by a prudent manager.

Likewise, the Court concludes that Williams' report to Martin was not prompted, in any part, by age-based animus. Williams' report was, as he described it, balanced. Williams was glowing about the plaintiff's technical skills and personal attention to detail, but candid about the plaintiff's shortcomings as an effective manager of some very underperforming employees. Had Williams wanted to absolutely jettison plaintiff's chances for the promotion--for whatever reason--he could have neglected to mention the good qualities that plaintiff brought to the job. Moreover, there is no evidence that Williams was even aware of plaintiff's competitors for the position and therefore he would not have necessarily known that a substantially younger person would ultimately receive the promotion, should plaintiff's application founder.

-18-

Finally, Williams and Martin had experienced substantial problems with the maintenance department and wanted to change Atlanta's reputation as one of the worst regions in the nation, in terms of maintenance. There is no reason to believe that either man was motivated by any consideration other than the desire to find the best individual for the job.

In summary, the Court concludes that the decision to promote Sean Andrews, instead of the plaintiff, to the EAS-22 MMO position at the Crown Road plant was not motivated in any respect by considerations of the plaintiff's or of Andrews' age.[6] That being so, the plaintiff has failed to prove age discrimination and the Court finds for the defendant in this case. Judgment shall be entered accordingly.

SO ORDERED, this ___30___ day of March, 2006.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

---

[6] Even if Davenport, Martin, and Williams were wrong in their collective assessment of the plaintiff, it is well established that an employer may refuse to promote an employee for any reason--good or bad, fair or unfair--as long as the reason is not unlawfully discriminatory. *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). *See also Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).

-19-